Richardson, J.
delivered the opinion of the Court.
In August,. 1822, Mrs. E. Peake was the owner of the negroes in question.
By her last will, proved before the Ordinary, 28th August, 1822, Mrs. P. bequeathed these negroes to the plaintiff, J. Vinyard, and made him executor ; but enjoined that the negroes were “ by no means to be considered in a state of slavery.”
Under this injunction, Mr. Vinyard permitted the ne-groes to have their own time, as if they were, in the terms of his testatrix, “ by no means to be considered in slavery.” Vinyard was clearly not the true beneficiary. But by law, he became the owner of the slaves. This practical enlargement from the bonds of slavery continued to December, 1842 — more than 20 years from the death of the testatrix, and of course, from the ownership of Vinyard. But in December, 1842, he re-took possession of the negroes; they soon escaped and came into the possession of Mr. Passalaigue, who claimed them as his property. But at the trial of the case, he declared his object was to keep the negroes free. Thus it would seem, that both parties united in sentiment. This statement of the facts of the case, together with the statute of 1820, (7 Statutes,) which prohibits any oth#r emancipation of a slave than by an Act of the Legislature, constitute the premises of the charge of *541 the Circuit Judge. The jury were instructed, that since the Act of 1820, emancipation could only regularly take place by Act of the Legislature; but that time, (twenty years,) stood in the place of all written muniments of title. If, therefore, the negroes had been permitted to go at large and be free for 20 years, the jury might presume that they were legally manumitted and set free, i. e. by Act.
The appeal from such judicial charge to the jury, is this — that in any view of the evidence, the laws of South Carolina do not justify the presumption of a statute, for the purpose of perfecting the supposed emancipation.
The legal proposition of the Judge, that such a statute might be presumed, is to be affirmed or disaffirmed by the Court.
It is conceded law, that after twenty years’ possession of property, the absolute presumption of law is, that all the usual written muniments of title belonged to such possessor and occupant of the property, so as to vest it fully in him. But can there be, by law, the like presumption of a statute to emancipate negroes? Is such an Act to be presumed, like a common muniment of title? I would by no means say, that no Act of the Legislature can be established by presumption.
Several dicta of learned and authoritative Judges have been cited, in favor of such presumption of a statute; and one very respectable writer (Best “ on Presumptions,” p. 145,) lays down the rule as extending to statutes. But I suspect that the instances are confined to statutes within the plain intendment of law and order, to guard an inveterate possession of property ; but which presumed statutes, must in no way run counter to the policy of the State. — ■ Such is the solitary instance of Stafford Sg Llewellin, cited by the Judge in Skinner, 77. It consisted in the presumption of a statute to enable the Black Prince to convey the lands which had been long in defendant’s possession. But the case itself is not reported, Presumptions are called the intendments of law. They are in pursuance of the allowed principles or permissions of the established law; but cannot be permitted, when they are in hostility to them.
*542 Let us then enquire, what are the laws of South Carolina upon the subject ot African slaves.
By the Act of 1740, 7 Stat. S97, it is enacted that “ al negroes, Indians (free Indians in amity with this govern naent and negroes, mulatioes, and mustizoes, who are now free, excepted,) mulattoes or mustizoes who now are, or shall hereafter be, in this province, and all their issue, offspring, born or 1o be born, shall be, and they are hereby declared to be, and remain forever hereafter absolute slaves, and shall follow the condition of the mother, and shall be deemed, held, taken, reputed and adjudged in law to be chattels personal, in the hands of their owners and possessors, and their executors, administrators and assigns, to all intents, constructions and purposes whatever,” &c. &c.
The Act further provides, that in all suits, for the freedom of a negro, “ it shall be always presumed that every negro, Indian, mulatto and mustizoe, is a slave, unless the contrary can be made to appeal:, (the Indian in amity with this government excepted,) in which case the burthen of the proof shall lie on the defendant.”
After an unbroken senes of Acts predicted upon the same’ State policy, we come to the Act of 1800, prohibiting- any emancipation except after a strict personal examination of justices and freeholders, 7 Stat. Lastly comes the Act of 1820, prohibiting any emancipation except by Legislative Act, 7 Stat. As the case will turn upon the doctrine of presumptions, let me give an instance or two of presumptions that have been well established, by way of illustration .
The law authorizes and urges the payment of bonds and judgments, therefore, they may be presumed to be paid, after the lapse of twenty years ; it is the same of all authorized muniments of title : after long possession, they are presumed in the occupant.
The law provides for the issuing of grants for vacant land — therefore, grants may be presumed from long possession. But suppose the land office closed ; in that case, no such presumption would be made, because you cannot presume against law. This last instance is the only one *543 analogous to the presumption before us, and shows it to be inadmissible.
The law discourages and forbids emancipation; shall we then presume such emancipation by a special law, in the face of such evident intendment to the contrary? But further, special presumptions take precedence of general presumption ; Best 54. The express presumption of the law is, that Africans are slaves. Shall we raise up an antagonistic presumption, to counteract that special one of the Act of 1740 ? Surely not.
But again, “ it (presumption) does not extend to records and public documents which are of record for their preservation, and therefore must be proved by search in the proper office, and if lost, by secondary evidence.” See 1st Greenleaf, 24 ; 5 Pick. 490.
And assuredly a Statute is emphatically one of such public documents on record. The case of presuming grants for lands, would seem an exception : perhaps, because a grant is a'common muniment of land titles. But even a grant cannot be presumed against law. I have endeavored so far, to-put the present decision out of the reason for the doctrine of absolute presumptions of law, or what civilians call presumptiones juris et de jure. But such presumptions of law and out of the law itself cannot ex vi termini be against the law. Legitimate presumption is the inference of law and reason, from the facts proved by something indicated by, though beyond such facts. It follows, that, the inference cannot stand when it conflicts with the law. All the legal presumptions cited by Greenleaf, from p. 18 to 49, 1 vol., to illustrate the general rule, plainly imply this exception. Let me give a single instance taken from the highest authority ; (Story’s Conflict of Laws, 36, 37. The Bank of Augusta v. Earle, 13 Pet. 519.)
A spirit of comity and friendly intercourse are presumed among nations, and if there be no express rule affirming or denying the operation of foreign laws, Courts presume their adoption by their own government, unless repugnant to its policy or interests. — 1 Green., p. 45. Now to conclude this head of the argument, admit that statutes may be presumed *544 in some cases — can you even then presume the statute required, when it would be repugnant to the policy and laws of the State 1 It cannot be done, because it would be against the sense of lawful presumptions. I now proceed to show that the case is decidedly settled by the very recent adjudication in the case of McCarty against McCarty, and to point out the strict analogy between that case and the present, confident that the good sense of our law, respectively applicable to them, will be apparent and satisfactory.
The question in McCarty's case was, whether we can presume an Act passed to divorce husband and wife, in any case, (that being tíre only way of effecting a divorce). In the case of McCarty against Me Garty, the plaintiff made out a just title to the land. But he claimed, through the deed of Mrs. Worthington. The defence was, that she being a married woman, her deed was void. The evidence proved that Mr. and Mrs. Worthington were lawfully joined in marriage in the year 1799; but that the ill-assorted pair forthwith separated, disavowed the marriage bonds, and remained apart, as unwedded persons, to the time of trial — i. e. for forty-nine years. The question 'was then made — may not the Court and jury, in favor of so fair a title, and of such unhappy connubial bonds, and after so great a lapse of time, presume an Act of the Legislature, separating the man and wife ?
The Court decided, that however common such a legislative Act in many States, it would be a presumption against the settled and wise policy of this State, which makes the marriage tie not merely during good behavior, or subject to the will or management of the parties, but lasting as the vinculum matrimonii, at common law; and for the same reasons, this guard of order, temperance and virtue in men,, and of the justice due to woman, is made absolutely indissoluble during the lives of the wedded pair. That therefore, and by force of such settled State policy, no such presumption can be judicially permitted. In the case of the State v. Barfield, 1 R. the Court affirmed the same principle, even in the case of an incestuous marriage. Because any instance, once so tolerated, might in time introduce an entire innovation in this stern and enduring, but wholesome and essential principle of the family compact between the sexes. The entire reasoning and policy in this decision of McCarty against McCarty, apply strictly to the case of Vinyard and Pass ail-aigue. A presumption, equally repugnant to this State’s policy, is demanded.
In the former, the inflexible rule of marriage has its moral justification in the human mind and character. Bind a man *545 down to any situation, without possible expectation of change,, and he instinctively seeks his own happiness from that very situation, untoward as his lot may seem to other men. Every one is conscious of this instinct of human nature. It consists-in no more than justness of conduct to a man’s self. In the' casé now before the Court, this strict State policy, prohibiting all emancipation of slaves within the State, by the owner,, has further a necessary and moral justification, arising from, the long experience of very many of these United States — all of which, at least all that were once British Colonies, held, by-British laws, African slaves.
And the experience of all these States is, that the white Caucasian and the black African races cannot live together upon terms of equality. Wherever tried, whether in the English settlements on the coasts of Africa, or as coolies in Jamaica, or as apprentices in Illinois, or as emancipated in New York or Philadelphia, Africans become, and do, as fully as in Charleston, constitute the contented menials, or other subordinate servants of white men. There is no where any practical equality. In this brief notice of .the State policy, and its. reasons, upon which is predicated the prohibitory Act of 1820,, a policy plainly developed by the slave Act of 1740, we may perceive the whole argument that forbids, as in the case of marriage, the presumption that an Act-of emancipation had been passed by the Legislature. Such a presumption, from ¡on-ly twenty years’' of evidently permissivq, exemption from practical slavery, would be not merely incredible,, but would run directly counter to the express presumption of the Act of 1740 — that all Africans shall be presumed slaves, until their emancipation be proved.
In a word, the presumption, enacted by the Act, and which .expressly requires evidence to rebut it, estops all counter presumption.
But laying aside'all legal rules, who does not know of many instances of negroes, still slaves to their masters, yet commanding their own time, and practically, at least, in the language of Mrs. P. “ by no means in slavery.” Under-such injunction from Mrs. P., the ready acquiescence of *546 Mr. V., and this practical enlargement of faithful or favorite negroes, which is so frequent, what reason is there to strain presumptions, as counter to the policy of the law 'l As to our knowledge of the subject, and our credence of the probable truth of the case, there can be none.
The master that would make his slave absolutely free, must send him out of the State. But, if he would indulge further philanthropy, by keeping him here, the negro must run the risk of his being seized by any stranger; and the master, that of being liable for his necessary support. For this see the case of City Council v. Cohen, where the negro being abandoned, and unable to support himself, the master was held liable to the city for his reasonable support.
Thus by our laws, the master cannot free himself from his legal liability, by his own emancipation. Our slave code is consistent and essentially suited to the natural endowments of the white and black man ; and in no way is it regardless of just humanity to slaves.
But it is settled, strict, undisguised, and express in its policy: therefore, we cannot presume a Legislative Act of emancipation. It must be proved, before the master and the negro can be divorced from their respective legal ties. A new trial is therefore ordered.
Evans, J. Wardlaw, J. and Frost, J. concurred.
Johnston, Cn. Caldwell, Ch. and Dunkin, Oh. concurred in the order for a new trial.